UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

PEPPER SOURCE, LTD                                                            PLAINTIFF

v.                                      No. 2:22-cv-02057

OZONE LLC
d/b/a OZONE SOLUTIONS                                                        DEFENDANT

## OPINION AND ORDER

This matter came before the Court on October 17, 2023 for a 2-day bench trial on Plaintiff Pepper Source, Ltd.'s ("Pepper Source") amended complaint (Doc. 8) against Defendant Ozone LLC, doing business as Ozone Solutions ("Ozone Solutions"), for breach of contract.  Ozone Solutions counterclaimed for breach of contract, but the Court dismissed that claim with prejudice on summary judgment.  *See* Doc. 55.  Pepper Source seeks reimbursement of the $199,811.20 it made in partial payment for a custom ozone system.

At trial, the parties stipulated to certain exhibits which were received into evidence.  *See* Doc. 59-1.  The Court also heard live testimony from four witnesses: Barbara Smith, Pepper Source's Vice President of Food Safety and Quality Assurance; John Kamp, Plant Manager of Pepper Source's Van Buren location; Sannel Patel, Ozone Solutions' Senior Vice President of Engineering; and Kevin York, Ozone Solutions' Chief Executive Officer.  At the conclusion of the trial, the Court took the case under submission.

Following a bench trial, "the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).  However, "[t]he trial court need not make specific findings on all facts and evidentiary matters brought before it, but need find only the ultimate facts necessary to reach a decision in the case."  *U.S. ex rel. R.W. Vaught Co. v. F.D. Rich*

1

*Co.*, 439 F.2d 895, 899 (8th Cir. 1971). Findings are adequate so long as they "afford a reviewing court a clear understanding of the basis of the trial court's decision." *Allied Van Lines, Inc. v. Small Bus. Admin.*, 667 F.2d 751, 753 (8th Cir. 1982) (internal quotation marks omitted). Accordingly, having considered the testimony of the witnesses and the exhibits received into evidence, and having made credibility determinations on the evidence, the Court makes the following findings of fact and conclusions of law.

## I.   Findings of Fact

### a.   The parties, proof of concept studies, and contract formation.

Pepper Source is a manufacturer of gourmet sauces, marinades, and glazes. These sauces come in packets and cups, ranging in size. The sauce packets can be as small as the ketchup packets or as large as packets that hold 180 ounces. As a food manufacturer, Pepper Source must comply with certain Food & Drug Administration regulations. Historically, Pepper Source's products have had "ready-to-eat" statements for the inside of their products. A "ready-to-eat" statement for processed foods means that a consumer can eat the food without doing anything else to the food, such as cooking it. At some point in early 2020, Pepper Source's customers approached Pepper Source about manufacturing products with a "ready-to-eat" statement for the *outside* of the packets. As an example, a "ready-to-eat" statement on the outside of the packet would allow Pepper Source's customers to wrap the packets up with a premade sandwich. The importance of the "ready-to-eat" statement on the outside of the package means that a consumer would be able to eat the food touched by the packet without cooking the food. In sum, a "ready-to-eat" statement for the inside of a packet means the inside is sanitized, and a statement for the outside of the packet means the outside of the packet is sanitized.

When customers approached Pepper Source with this idea, Pepper Source did not have the capability to manufacture packets with a "ready-to-eat" statement on the outside of packages. To manufacture the new packets, Pepper Source approached Ozone Solutions about building a custom ozone system ("System"). The System would allow Pepper Source to sanitize the packets in accordance with FDA regulations. Specifically, the System needed to achieve a "5-log reduction" in bacteria. In plain language, achieving a 5-log reduction is necessary to show the product has been sanitized and is safe from certain pathogens, such as listeria and salmonella.[1] Pepper Source contacted Ozone Solutions about manufacturing this System because Pepper Source had previously worked with Ozone Solutions.

The parties worked together in 2020 on a series of proof-of-concept studies. The studies were necessary because when the parties first discussed the System, Ozone Solutions did not have a system that could achieve a 5-log reduction. Ideally, the studies would show Ozone Solutions could create such a system. These studies focused on proving the concept using only Pepper Source's packets, not its cups. Six proof-of-concept studies took place. The last study, in December 2020, achieved a 5-log reduction. Because the last study showed a 5-log reduction, the parties moved forward with a contract.

The parties signed the contract on December 31, 2020. *See* Pl. Ex. 1, p. 1. The contract contained two sections. *Id.* The first section described what components would make up the System. *Id.* Ozone Solutions manufactured some of those components and procured other components from third-party vendors. The second section of the contract included payment terms

---

[1] This lay description of 5-log reduction is sufficient to resolve the parties' claims. The Court does not need to use a more detailed scientific explanation.

and described a process for obtaining a validation study to ensure the System could achieve a 5-log reduction:

> 2. Performance Statement
>
> a. Upon completion of the unit & prior to receipt of the unit, Pepper Source will pay for a validation study to confirm the unit meets the required 5-log reduction based on previous trial parameters.  If for any reason the unit does not meet the 5-log reduction requirement, Pepper Source will allow 30 days for Ozone Solutions to make modifications to the unit in [sic] to meet the 5-log reduction.  After modifications are made, Pepper Source will perform a 2nd validation study to confirm the 5-log reduction.  Pepper Source will be reimbursed for all costs associate [sic] with the 2nd validation study.
>
> b. If a 5-log reduction is not met after 2 attempts of a validation study, Pepper Source will not be responsible for any remaining outstanding payments & will be reimbursed for any & all payments that have been made on the unit up to that date.

(Pl. Ex. 1, pp. 1–2).  The two parties responsible for drafting the contract were John Kamp from Pepper Source and Sannel Patel from Ozone Solutions.  According to Mr. Patel, Mr. Kamp drafted the performance statement in its entirety.  Kevin York, Ozone Solutions' CEO, was involved in setting the final price for the System.  The contract called for a 50% down payment, a 30% payment due on completion of the unit, and the remaining 20% due "after successful challenge study & 30 days of operation at Pepper Source facility."  *Id.*  Pepper Source made the 50% down payment on January 6, 2021.  (Pl. Ex. 2).

**b. Fabrication, a failed validation study, and modifications.**

After entering into the contract, Ozone Solutions began making the System.  The System used ozone to sanitize the packets.  Ozone is a chemical with three oxygen molecules.  The chemical is highly reactive, which makes it a good agent for disinfecting.  Broadly, the System consisted of a conveyor belt, a Dualzone ozone system, nozzles, destruct units, and an air knife system.  (Pl. Ex. 1).  Ozone Solutions manufactured the Dualzone system, which administers ozone gas and ozone water.  It also manufactured the destruct unit, which destroys the ozone and converts

4

it back into oxygen.  Ozone is harmful to humans unless destroyed.  A third-party vendor manufactured the conveyor belt, nozzles, and air knife.  An air knife blows a flat, concentrated stream of air.  At trial, witnesses likened the air knife to some newer models of hand dryers in public restrooms or the burst of air when you enter a grocery store.

The parties intended the System to work like this:  A Pepper Source employee would place sauce packets on the conveyor belt.  As the packets entered the System, the System would spray the packets first with ozonated water and then ozonated gas, sanitizing the packets.  The air knife system would then dry the packets so the packets could be shipped straight to customers.

While constructing the System, Ozone Solutions struggled with some supply chain issues and changed conveyor vendors at Pepper Source's request.  Nevertheless, Ozone Solutions finished the unit, and per the contract's payment terms, invoiced Pepper Source the 30% of the unit price due at completion.  *See* Pl. Ex. 1 (contract); Pl. Ex. 3 (invoice).  Ozone Solutions issued the invoice on June 24, 2021, and Pepper Source paid the invoice on July 7, 2021.  (Pl. Ex. 3).  Mr. York agreed the unit was complete at that time because the 30% payment was not supposed to be invoiced until Ozone Solutions completed the unit.  Pepper Source shared the understanding that because it was invoiced the 30% amount, the System was indeed ready for the validation study.

In July 2021, the parties agreed to the parameters of the validation study.  Pepper Source retained Food Safety Net Services ("FSNS") to conduct the validation study.  The study would test the System's ability to sanitize both packets and cups provided by Pepper Source.[2]  (Pl. Ex. 4, Bates no. -165 to -173).  Although both cups and packets would be run through the System, the parties agreed that the only results that mattered for the contract were the packets.  As stated above,

---

[2] In addition to packets, Pepper Source also manufactures cups of its marinades and sauces. The largest cup is roughly three inches in diameter and three inches tall.

to pass the validation study, the System needed to achieve a 5-log reduction of the tested bacteria: salmonella enterica and listeria. *See id.* at Bates no. -165.

The parties held the validation study from September 14–16, 2021. The study was marred by many issues. Days before the study, Ozone Solutions informed Pepper Source the air knives were not working correctly, so the air knives were not used during the study. The nozzles were not turned on the first day of the study. The second day, only one set of nozzles was turned on. Another issue was off-gassing. Off-gassing occurs when ozonated gas, which is harmful to humans, leaks out of the system. Ozone Solutions attributed some of these issues to needing to run both packets and cups through the System when the earlier proof-of-concept studies only included packets.[3] Despite these issues, the parties completed the study.

Pepper Source complained to Ozone Solutions about these issues. *See* Pl. Ex. 6. Pepper Source believed Ozone Solutions treated the validation study more like a proof-of-concept study. Pepper Source was particularly frustrated that the FSNS parameters "were violated due to [Ozone Solutions'] lack of adherence to equipment specifications outlined in the previous trials. . . ." *Id.* at Bates no. -048. Pepper Source was also frustrated that there were multiple changes made during the study. *Id.* Mr. Patel from Ozone Solutions reassured Pepper Source that Ozone Solutions wanted to take care of these issues for Pepper Source. *Id.* Mr. Patel also asked for the results of the study once they were final. *Id.*

In the end, the System failed the validation study. (Pl. Ex. 5, Bates no. -056 to -057). Specifically, the System did not achieve a 5-log reduction of salmonella on the packets. *Id.* FSNS reported the results to Pepper Source on September 27, 2021. *Id.* Based on the contract, this would

---

[3] Ozone Solutions did not object to testing the cups, in the spirit of wanting to satisfy its client, Pepper Source.

set an October 27, 2021 deadline for modifications.  *See* Pl. Ex. 1.  About a week after receiving results, the parties met in person at Ozone Solutions' Springdale, Arkansas location.  The parties discussed the issues from the first validation study and how Ozone Solutions planned to modify the System so that it could pass the next test.  One part of the meeting was a smoke test that demonstrated the off-gassing.  Pepper Source left the meeting with the understanding that Ozone Solutions knew what was wrong with the System and how to fix the problem.

The parties' next discussions were almost exclusively over email.  *See* Pl. Ex. 7.  Two weeks after the meeting, Barbara Smith of Pepper Source asked for an update.  *Id.* at Bates no. -045.  Mr. Patel responded in part: "We have found a solution on the conveyor; we are currently testing the theory."  *Id.* at Bates no. -044.  Mr. Kamp of Pepper Source then asked if this was a new problem because "[Pepper Source was] told in our meeting 2 weeks ago that [Ozone Solutions] had confirmed the issue and fabrication was to take place?"  *Id.*  Mr. Patel did not directly respond, instead saying: "We worked on the conveyor and we have know whats happening.  That is why we think that the destruct media is creating too much back pressure, as the system is working great with no ozone destruct in line.  That is why we have purchased a few more components to fix the back pressure issue from the destruct."  *Id.* at Bates no. -043.[4]  A week passed, and Mr. Kamp again reached out for updates.  *Id.* at Bates no. -042.  He received responses from two Ozone Solutions employees: Mr. Patel and Kierstin York.  *Id.* at Bates no. -035, -041, -042.  Both of their responses indicated Ozone Solutions had found a simulation that worked and that it would soon begin fabricating the changes to the System.  *Id.*  On November 1st, Mr. Kamp replied "Thank you both for the updates last week.  I have no doubt that OS team has been working

---

[4] Some of the parties' emails contain typos or grammatical errors.  The Court will not correct these errors so as to leave the parties' communications in their original form.

diligently to find a solution.  We only ask that we are kept abreast of the situation and/or delays." *Id.* at Bates no. -035.

Another two weeks passed, and Mr. Kamp again reached out for an update.  *Id.* at Bates no. -034.  Hearing no response, Mr. Kamp asked again two days later.  *Id.*  Mr. Patel responded that Ozone Solutions had positive results, but also said "I promise you that we are getting close. . . . Once we can produce the result we are searching for, the conveyor will be sent to the fabrication shop (Steelworx) to be built to our specifications."  *Id.* at Bates no. -034.  Mr. Kamp responded about two weeks later to ask if the next validation study had been scheduled.  *Id.* at Bates no. -033. He also mentioned that it had been two months since their October 4th meeting where the parties "discussed the 'fixes' being made."  *Id.*  In response to this, the parties agreed to set up a phone call.  *Id.* at Bates no. -032.

Representatives of both parties held a December 13th phone call.  None of the trial witnesses perfectly recalled what was discussed on the call.  Ms. Smith did not recall much but claims she would have remembered if Ozone Solutions said the System was ready.  Mr. Kamp testified the meeting was simply about more updates on Ozone Solutions' progress.  Mr. Kamp also testified that Ozone Solutions had not started fabricating any modifications as of the meeting. Mr. Patel said that Ozone Solutions informed Pepper Source that the System was ready for a second validation study.  However, no second test was scheduled, as Mr. Patel had not contacted FSNS about validation studies since November 10th.  (Pl. Ex. 8, Bates no. -043).

At the time of the call, the plan for testing the System had changed.  Ozone Solutions, at Ms. Smith's suggestion, was going to arrange and pay for a small study with FSNS.  *See id.*  If that smaller study was successful, then the parties would schedule the second validation study.  *Id.* at Bates no. -043 to -045.  The testing schedule was further complicated by Mr. Patel's travel plans.

8

At the end of December, Mr. Patel left the country for a vacation.  Mr. Kamp vaguely recalls discussing Mr. Patel's trip on the December 13th call.  Ozone Solutions says someone told them not to worry about testing the System until after Mr. Patel's trip, but Mr. Kamp does not recall saying this.  Regardless, Mr. Patel was out of the country until January 14th, which complicated the schedule because Mr. Patel planned to be at the study.  Through all of this, the second validation study had not been scheduled.

In January 2022, Ozone Solutions provided three more updates to Pepper Source about the System.  First, Mr. Patel emailed Pepper Source that Ozone Solutions had some ideas on how to "make this work."  (Pl. Ex. 9, Bates no. -388).  Second, two weeks later, Mr. Patel reported progress on the System, including that Ozone Solutions resolved the ozone leak issues.  *Id.* at Bates no. -387.  But the longest time the System had been successfully operated was one hour.  *Id.*  Third, Mr. Patel emailed that Ozone Solutions had now run the conveyor "at 75-100% for 2-4 hours and [had] seen no off-gas."  *Id.* at Bates no. -386.  Mr. Patel also said Ozone Solutions was speaking to the conveyor company to see how to make the required changes.  Mr. York testified that Ozone Solutions was still working on modifications in January, but those modifications were only to accommodate the cups.  He maintained the System was ready to be tested for packets.

At the same time these updates were given, Pepper Source decided to not move forward with purchasing the System.  Shortly after the December 13th call, Pepper Source leadership told Mr. Kamp and Ms. Smith to limit communications with Ozone Solutions because Pepper Source's legal team would be getting involved.  After that, the only communication between Pepper Source and Ozone Solutions, other than Mr. Patel's three updates, was a short phone call between Mr. Kamp and Mr. Patel.  Mr. Patel called Mr. Kamp on January 31, 2022 to provide an update on the system, but Mr. Kamp insinuated he could not talk for long because matters were out of his hands.

### c. Reimbursement demand and fallout.

Matters were out of Mr. Kamp's hands because Pepper Source decided to demand reimbursement of its previous payments for the System. *See* Pl. Ex. 10. Pepper Source's counsel sent a letter demanding reimbursement on January 31st, the same day as the call between Mr. Patel and Mr. Kamp. *Id.* Pepper Source explained that the Performance Statement clause of the contract (block quoted on page 4 above) applied. *Id.* In sum, Pepper Source sought reimbursement because "[g]iven that the System has not passed a second validation study despite over four months to do so, the time for complying with the terms of the Estimate has now expired." *Id.* Pepper Source demanded the $199,811.00 in payments be reimbursed by March 1, 2022.[5] *Id.*

Earlier that same day, Mr. Patel had finally reached back out to FSNS about scheduling the second validation study. (Pl. Ex. 8, Bates no. -041). Again, Mr. Patel had not contacted FSNS since November 10th. *Id.* at Bates no. -042. The November emails about studies copied both Ozone Solutions and Pepper Source employees. *Id.* Starting January 31st, however, Mr. Patel removed Pepper Source employees from his emails with FSNS. *Id.* at Bates no. -041. Over the next few days of early February, Mr. Patel emailed FSNS to schedule the second validation study, which would only test packets. *Id.* at Bates no. -034 to -041. Ozone Solutions asked for a test from March 21 to 23rd, but FSNS and Ozone Solutions settled on a test for March 14th. *Id.* at Bates No. -034.

As Mr. Patel worked to finalize a date for the second validation study, Ozone Solutions' counsel interceded on its behalf with Pepper Source's counsel to respond to the demand letter. *See* Def. Ex. 112. Ozone Solutions' counsel emailed Pepper Source's counsel twice, trying to confirm

---

[5] Although the letter requested this amount, Pepper Source's invoices show it paid 20 cents more. *See* Pl. Ex. 2; Pl. Ex. 3. The Court will assume this 20-cent difference is a typo.

if Pepper Source would agree to a March 19th date for the second validation test. [6]   *Id.* at Bates no. -029 to -030.   This March date is the one Mr. Patel arranged.   Pepper Source's counsel responded to say it was not aware of any March test, and it would not agree to alter the parties' written agreement.   Specifically, Pepper Source's counsel said: "Because of the lapse of time per the parties written agreement, the lack of timely notice from Ozone Solutions regarding the equipment since the failure of the Sept. 2021 test, the lack of timely notice and detail regarding this proposed March 19 test and the stated need for an immediate response by today or Friday, Pepper Source is not agreeing to participate in this test or to pay for this test."   *Id.*   After that, Ozone Solutions' counsel sent a letter stating it was cancelling the March study and treating Pepper Source's response as a wish to no longer purchase the System.   (Def. Ex. 113).   Ozone Solutions stated it would mitigate its damages.   *Id.*   Ozone Solutions represented to the Court in its trial brief and summary judgment briefing that it sold part of the equipment and retained another part as part of its mitigation.   *See* Doc. 55, pp. 4–5.   Pepper Source sued Ozone Solutions two months later. (Doc. 2).

### d.  Summary

While the above reflects the Court's entire findings of fact, the Court emphasizes here some salient findings.   The parties entered a contract on December 31, 2020 for a custom ozone system. (Pl. Ex. 1).   The contract required the System to pass a validation study.   *Id.*   The System failed the first validation study in September 2021.   (Pl. Ex. 5, Bates no. -056 to -057).   Ozone Solutions attempted to make modifications, but it had not begun fabricating those modifications as of January

---

[6] The Court is unsure where this March 19th date came from.   March 19, 2022, was a Saturday.   Mr. Patel arranged a study with FSNS for the March 14th, after FSNS stated it could not do the week of March 21st.   (Pl. Ex. 8, Bates no. -034).   The Court will find this March 19th date was meant to be March 14th.

31, 2022.  *See* Pl. Ex. 9, Bates no. -386.  Ozone Solutions was still working on these modifications

in January 2022, while also claiming the System was ready for a second validation test in early

December.

Pepper Source was largely kept informed about Ozone Solutions' efforts on the

modifications.  *See* Pl. Ex. 7.  In October, both parties were on an email chain with FSNS

discussing a second validation study, but the parties never agreed to a date.  A second validation

study never occurred.  Throughout all of this, Pepper Source did not bring up the contract clause

providing for a 30-day window for modifications until its January 31, 2022 letter demanding

reimbursement.  (Pl. Ex. 10).

## II.   Conclusions of Law

There is complete diversity of citizenship and the amount in controversy exceeds $75,000,

so the Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332.  Arkansas law

applies because federal courts sitting in diversity apply the forum state's law.  *Guardian*

*Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 515 (8th Cir. 2007).  Neither party

disputes this contract was for the sale of goods, so Arkansas' Uniform Commercial Code applies

to the contract.  Ark. Code Ann. § 4-2-102 (the UCC applies to goods); § 4-2-105 (defining goods

as "all things (including specially manufactured goods) which are moveable at the time of

identification to the contract for sale").

### a.   Breach of Contract

Under Arkansas law, a party asserting a breach of contract has the burden of proving "(1)

an enforceable contract exists, (2) the defendant has a duty under the contract, (3) the defendant

violated that duty, and (4) the plaintiff was damaged."  *Smith v. S. Farm Bureau Cas. Ins. Co.*, 18

F.4th 976, 980 (8th Cir. 2021) (citing *Smith v. Eisen*, 245 S.W.3d 160, 168–69 (Ark. Ct. App.

2006)).  "When interpreting a contract, courts 'must, if possible, ascertain and give effect to the intention of the parties.'"  *Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017) (quoting *Harris v. Stephens Prod. Co.*, 832 S.W.2d 837, 840 (Ark. 1992)).  To give effect to the parties' intentions, courts should harmonize clauses together and give words their plain, ordinary meaning.  *Id.* (citing *First Nat'l Bank of Crossett v. Griffin*, 832 S.W.2d 816, 820 (Ark. 1992)).  The parties do not dispute the contract's existence, so the Court will turn to interpreting the parties' respective duties and whether Ozone Solutions violated that duty.

Pepper Source argues that Ozone Solutions breached the contract when it failed to make the necessary modifications to the System within the 30-day period listed in the contract.  The Court concludes that Ozone Solutions had a duty to make modifications within 30 days of a failed first validation study.  A plain reading of the contract compels this conclusion.  But the Court agrees with Ozone Solutions that Pepper Source waived the 30-day requirement.

To show waiver of a contractual requirement, Ozone Solutions has the burden to prove (1) Pepper Source knew it had the contractual rights and (2) Pepper Source voluntarily and intentionally abandoned the rights.  *See* Ark. Model Jury Instruction 2436; *see also Bharodia v. Pledger*, 11 S.W.3d 540, 545 (Ark. 2000) ("Waiver is the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits.").  While a waiver must be voluntary and intentional, it does not have to be stated expressly.  *See, e.g.*, *Jet Asphalt & Rock Co., Inc. v. Angelo Iafrate Const., LLC*, 431 F.3d 613, 617–18 (8th Cir. 2005) ("[A] party may waive a breach of a condition set forth in a written contract by permitting the other party to proceed with performance of the contract after discovering the apparent breach.").

For example, a waiver occurred when a party could have objected to using a specific subcontractor but failed to do so and allowed that subcontractor to be used for most of a construction project. *See id.* Since the party did not initially object to the subcontractor, the party waived its right to object to the subcontractor later. *Id.*; *see also Grayson–McLeod Lumber Co. v. Slack Kress Tie & Stave, Co.*, 143 S.W. 581, 583 (Ark. 1912) ("It was appellant's duty, when it discovered the apparent breach of the contract, if it intended to insist upon a forfeiture, to do so at once. By permitting appellees to proceed with the performance of the contract it waived the breach.").

Three examples of Pepper Source's conduct support a finding of waiver even though Pepper Source never expressly waived the 30-day provision. First, Pepper Source never invoked the 30-day provision before its demand letter. Mr. Kamp drafted that provision, yet he never mentioned the 30-day provision in his requests for updates. Second, on November 1st, Mr. Kamp emailed Mr. Patel, "Thank you both for the updates last week. I have no doubt that OS team has been working diligently to find a solution. We only ask that we are kept abreast of the situation and/or delays." (Pl. Ex. 7, Bates no. -035). The 30-day period would have expired on October 25th, but that day came and went with Pepper Source only asking to be kept informed about modifications. Third and finally, Pepper Source continued to ask for updates on the modifications up until the December 13th phone call, which was over 45 days beyond the 30-day deadline.

The Court concludes this conduct shows that Pepper Source waived any breach of the 30-day modification period by Ozone Solutions. The Court can understand Pepper Source's frustration with the delay, but it should have insisted on conducting the second study rather than refusing to comply with its duty. This is not a case where Pepper Source continually complained about the breach while seeking to enforce the contract's terms. *See All-Ways Logistics, Inc. v.*

14

*USA Truck, Inc.*, 583 F.3d 511, 517–18 (8th Cir. 2009) (finding no waiver when plaintiff "immediately and repeatedly complained" to defendant about the breach).  In fact, Pepper Source did not complain about the breach until it invoked the 30-day provision to seek reimbursement of its payments on January 31, 2022. *See* Pl. Ex. 10.  Altogether, Pepper Source's conduct and failure to complain about the breach leads the Court to conclude that Pepper Source waived the 30-day provision of the contract.

Since Pepper Source waived the 30-day provision, Pepper Source cannot point to any other way that Ozone Solutions breached the contract.  Indeed, Pepper Source's next action was to demand reimbursement, stating it would not move forward with a second validation study.  This was a repudiation of the contract by Pepper Source.  The contract imposed a duty on Pepper Source to conduct and pay for a second study, with its costs reimbursed.  But Pepper Source's demand letter and its counsel's later email confirmed it would not participate in a second validation study. Ozone Solutions then informed Pepper Source it would proceed to mitigate its damages.  Ozone Solutions represented to the Court in its trial brief and summary judgment briefing that it sold part of the equipment and retained another part as part of its mitigation. *See* Doc. 55, pp. 4–5.

In sum, even if Ozone Solutions breached the contract by not completing modifications within 30 days, Pepper Source waived that breach by its conduct.  Much of trial was focused on the reasons for Ozone Solutions' delay.  Ozone Solutions cited both supply chain issues and Pepper Source's request to run both packets and cups through the System to explain its delay.  In the end, the reason for the delay is not relevant to the outcome.  Pepper Source waived any breach by continuing to ask for updates on the System, even well after the expiration of the 30-day period. Pepper Source then jumped the gun by repudiating the contract, rather than demanding a second validation study as the contract required.

### b. Damages

Pepper Source is not without a remedy.  Ozone Solutions correctly points out that the UCC contains a provision governing the liquidation or limitation of damages when deposits are involved.  *See* Ark. Code Ann. § 4-2-718.  Ozone Solutions suggests subsection two applies:

> (2) Where the seller justifiably withholds delivery of goods because of the buyer's breach, the buyer is entitled to restitution of any amount by which the sum of his payments exceeds
>
>> (a) the amount to which the seller is entitled by virtue of terms liquidating the seller's damages in accordance with subsection (1); or
>>
>> (b) in the absence of such terms, twenty percent (20%) of the value of the total performance for which the buyer is obligated under the contract or five hundred dollars ($500), whichever is smaller.

Ark. Code Ann. § 4-2-718(2)(a)–(b).  Ozone Solutions maintains in its trial brief that this means Pepper Source would be entitled to the lesser of $49,952.80 (20% of the contract price) or $500.  *See also* Doc. 49, pp. 6-7 (Ozone Solutions first made this argument in its summary judgment response).

Ozone Solutions' interpretation of the statute is flawed.  If this section applies, it would read "Where [Ozone Solutions] justifiably withholds delivery of goods because of [Pepper Source's] breach, [Pepper Source] is entitled to restitution of *any amount by which the sum of [Pepper Source's] payments exceed* . . . twenty percent (20%) of the value of the total performance for which [Pepper Source] is obligated under the contract or $500, whichever is smaller."  The section would thus award Pepper Source restitution for its payments of $199,811.20 that exceed the smaller of $49,952.80 or $500.  The section would not simply award Pepper Source the lesser of $49,952.80 or $500.

This UCC section serves a specific purpose, and this case illustrates why:

> "Subsection (2) refuses to recognize a forfeiture unless the amount of the payment so forfeited represents a reasonable liquidation of damages as determined under

> subsection (1).  A special exception is made in the case of small amounts (20% of
> the price or $500, whichever is smaller) deposited as security.  No distinction is
> made between cases in which the payment is to be applied on the price and those
> in which it is intended as security for performance. Subsection (2) is applicable to
> any deposit or down or part payment."

*See* Uniform Commercial Code Comments to Ark. Code Ann. § 4-2-718.  If this section does not apply, then Ozone Solutions could keep both the partial payment and the System, resulting in a forfeiture by Pepper Source.

Section 4-2-718(2) applies here to prevent a forfeiture.  Pepper Source repudiated the contract, so Ozone Solutions was under no obligation to deliver the goods.  Subsection (a) does not apply, because the contract does not contain a liquidated damages clause.  Subsection (b) applies instead.  Pepper Source is entitled to restitution of its payments in "any amount by which" its payments exceed $500 because $500 is the lesser of $500 and 20% of the contract price.  Therefore, Pepper Source is entitled to restitution of its payments minus $500, or $199,311.20.

The same section allows Ozone Solutions to offset damages, but Ozone Solutions has not presented evidence to do so.  "The buyer's right to restitution under subsection (2) is subject to offset to the extent that the seller establishes a right to recover damages under the provisions of this chapter other than subsection (1); and the amount or value of any benefits received by the buyer directly or indirectly by reason of the contract."  Ark. Code Ann. § 4-2-718(3)(a)–(b).  As discussed in the order on summary judgment, *see* Doc. 55, Ozone Solutions did not raise a material issue of fact concerning its right to damages for lost profits under the UCC.  Because of this, Ozone Solutions cannot offset the restitution it owes Pepper Source.

This result seems counterintuitive: Ozone Solutions did not breach the contract, yet Ozone Solutions must return nearly all of the down payments it received.  This anomalous result is due to the unique facts of this case.  Typically, an award of restitution would be offset by the seller's

damages.  *See* Ark. Code Ann. § 4-2-718(3).  That means if Ozone Solutions had presented evidence to show it was entitled to damages, then Pepper Source's restitution award would be reduced.  But as discussed above, the restitution cannot be offset at all because Ozone Solutions did not raise a material issue of fact about its entitlement to damages.  This case should not be viewed as an encouragement to buyers to breach contracts because they might recoup their entire down payments.  This case should be viewed instead as a unique situation where even though a seller did not breach their contract, the seller's inability to show damages resulted in a large restitution award to the buyer.

### c.  Attorney's Fees and Interest

Pepper Source also seeks attorney's fees and pre- and post-judgment interest.  (Doc. 8, p. 4).  Arkansas law applies to determine if Pepper Source is entitled to attorney's fees.  *Randy Kinder Excavating, Inc. v. JA Manning Constr. Co.*, 8 F.4th 724, 727 (8th Cir. 2021).  Meanwhile, "federal law governs the award of postjudgment interest . . . while state law governs the award of prejudgment interest."  *ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.*, 59 F.4th 905, 922 (8th Cir. 2023).

Arkansas law dictates that "[i]n any civil action to recover . . . for . . . breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs."  Ark. Code Ann. § 16-22-308.  An award of attorney's fees under this statute "is permissive and discretional with the trial court."  *Chrisco v. Sun Indus., Inc.*, 800 S.W.2d 717, 718 (Ark. 1990).  The prevailing party is the party who came out "on top" at the end of the case when looking at the case as a whole.  *Brackelsberg v. Heflin*, 386 S.W.3d 636, 640 (Ark. Ct. App. 2011).  It is also possible that neither party is the prevailing party.  *Id.* at 641.

The Court has determined that Pepper Source is the prevailing party because it will receive a money judgment. *See Cumberland Fin. Grp., Ltd. v. Brown Chem. Co.*, 810 S.W.2d 49, 51 (Ark. Ct. Ap. 1991) ("[T]he party in whose favor the verdict compels a judgment is considered to be the prevailing party. . . ."). But Pepper Source is only the prevailing party because of the operation of the UCC statute on damages when there are deposits. When considering the case otherwise, the Court concludes the parties' success was relatively even. Each party had one breach of contract claim against the other. Ozone Solutions' claim was dismissed on summary judgment. *See* Doc. 55. Pepper Source's claim also failed, as discussed above, because Ozone Solutions successfully showed Pepper Source waived any breach of contract.

To determine the amount of fees, courts should be guided by the *Chrisco* factors. *G & K Servs. Co. v. Bill's Super Foods, Inc.*, 766 F.3d 797, 801 (8th Cir. 2014) (citing *Chrisco*, 800 S.W.2d at 718). *Chrisco* suggests courts consider the following recognized factors:

> (1) the *experience and ability of counsel*; (2) the time and labor required to perform the legal service properly; (3) *the amount involved in the case and the results obtained*; (4) *the novelty and difficulty of the issues involved*; (5) the fee customarily charged in the locality for similar services; (6) whether the fee is fixed or contingent; (7) the time limitations imposed upon the client or by the circumstances; and (8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

*Id.* (quoting *S. Beach Beverage Co. v. Harris Brands, Inc.*, 138 S.W.3d 102, 108 (Ark. 2003)) (emphasis added). However, the Eighth Circuit has acknowledged that even under *Chrisco*, there is no fixed formula for computing attorney's fees and "we do not read its listing of 'recognized factors' to require that a court must discuss each one in every case." *Id.* Crucially, "[a]n evaluation of these factors may support an award of lower fees or an outright denial of fees." Howard W. Brill & Christian H. Brill, 1 ARK. LAW OF DAMAGES § 11:4 (6th ed. 2014).

After considering the relevant factors and looking at the totality of this case, the Court will not award attorney's fees. This was a straightforward breach of contract action, so neither the novelty nor difficulty of the case favors awarding fees. Additionally, when considering the results obtained, the Court notes that Pepper Source obtained its restitution award not because of the experience or ability of its counsel, but because Ozone Solutions failed to raise an issue of fact on damages that could offset the restitution award. The Court does not mean to suggest that Pepper Source's counsel is inexperienced or was somehow deficient. Instead, the Court seeks to illustrate that this case is, as discussed above in the damages section, an anomaly. Due to this anomaly and the fact that the size of the restitution award has more to do with Ozone Solutions' failure to offset damages than Pepper Source's success on the merits of its claim, the Court will not award attorney's fees despite concluding Pepper Source is the prevailing party.

Arkansas law governs the award of prejudgment interest. *ResCap Liquidating Tr.*, 59 F.4th at 922. Under Arkansas law, "prejudgment interest must be awarded if a method exists for calculating the plaintiff's damages at the time of the loss, i.e., 'the time of the occurrence of the event that gives rise to the cause of action.'" *All-Ways Logistics*, 583 F.3d at 519 (quoting *Sims v. Moser*, 284 S.W.3d 505, 519 (Ark. 2008)). The method for calculating damages must be "definitely ascertainable by mathematical computation, or if the evidence furnishes data that makes it possible to compute the amount without reliance on opinion or discretion." *Id.* at 518 (quoting *Sims*, 284 S.W.3d at 519).

The application of this standard here is straightforward. The amount of damages is easily ascertainable because the contract sets forth Pepper Source's payments, and the invoices confirm Pepper Source made those payments. *See* Pl. Ex. 1 (contract); Pl. Ex. 2 (invoice for 50% payment); Pl. Ex. 3 (invoice for 30% payment). The time of the occurrence of the event that gives rise to the

20

cause of action is also ascertainable.  As discussed above, Pepper Source was the party that ended up repudiating the contract.  On February 10, 2022, Ozone Solutions, via counsel, sent a letter to Pepper Source indicating that its understanding was Pepper Source did not want to proceed with the contract and that Ozone Solutions would mitigate its damages.  Def. Ex. 113.  That event gave rise to Pepper Source's recovery, as that is when Ozone Solutions justifiably withheld delivery, and Pepper Source became entitled to restitution.  *See* Ark. Code Ann. § 4-2-718(2).  Based on this, Pepper Source will be entitled to prejudgment interest on the $199,311.20 from February 10, 2022.

Arkansas sets the prejudgment interest rate by statute.  As relevant here, the statute sets the rate at "the rate provided by the contract or at a rate equal to the Federal Reserve primary credit rate in effect on the date on which the judgment is entered plus two percent (2%), whichever is greater."  Ark. Code Ann. § 16-65-114(a)(1)(A).  The Federal Reserve primary credit rate in effect today is 5.5%.  That rate, plus 2%, means the Court will award prejudgment interest at a rate of 7.5%.   There are 672 days between February 10, 2022 and December 14, 2023.  With a 7.5% interest rate accruing on $199,311.20, the prejudgment interest in this case totals $27,521.33.

Federal law governs postjudgment interest.  *ResCap Liquidating Tr.*, 59 F.4th at 922.  "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  28 U.S.C. §1961(a).  Postjudgment interest on Pepper Source's damages will therefore accrue at the rate of 5.08% per annum from the date of December 14, 2023 until paid.  The postjudgment interest will accrue on both damages and the prejudgment interest.  *See Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh*, 735 F.3d 993, 1008 (8th Cir. 2013).

**III.   Conclusion**

IT IS THEREFORE ORDERED that Plaintiff Pepper Source shall have and recover from

Defendant Ozone Solutions $199,311.20 in damages on its claim for breach of contract, and

$27,521.33 of prejudgment interest.  Judgment will be entered separately.

IT IS SO ORDERED on this 14th day of December, 2023.


/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE